Filed 12/13/24  P. v. Mack CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B332388 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA491269) |
| v. | |
| JAVON MACK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Karla D. Kerlin, Judge.  Affirmed with directions.

Peter S. Westacott, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Lauren N. Guber, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Javon Mack of willfully inflicting corporal injury resulting in a traumatic condition on a cohabitant, first degree residential robbery, and assault. The jury found true allegations Mack personally inflicted great bodily injury.

Mack argues the trial court abused its discretion in admitting evidence of uncharged acts of domestic violence. He also argues the court erred in imposing sentences on both his robbery conviction and his infliction of corporal injury conviction and in imposing an enhancement for great bodily injury on those two convictions. Finally, he argues the court erred in imposing a domestic violence fund fee. We agree the court erred in imposing the fee and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *February 2020: Mack Punches Andrea D. in the Face*

In 2018 Mack and Andrea D. moved together from Georgia to Los Angeles. Andrea paid the rent for the apartment she and Mack shared. In February 2020 Andrea found a business card with a woman's name and phone number in Mack's pants. When Mack heard Andrea say something under her breath about the card, he hit her in the nose, causing swelling in her face. He told her that she was "stupid" and "a dumb prick" and that she "had no right to be mad." Andrea drove herself to the hospital. She waited for two hours, but left before receiving care. The next day Andrea returned to the hospital with Mack. She told the doctor she slipped and fell in the bathtub.

B.     *October 2020:  Andrea Moves Out, and Mack Attacks Her in Her New Apartment*

Seven months later, Andrea decided to move out of the apartment she shared with Mack.  She told him she was looking for a new apartment.  In October 2020 Andrea moved out and did not tell Mack where her new apartment was.

On October 25, 2020 Mack sent Andrea text messages saying "Kill yourself," "Stop saying youre gonna do it and fucking do it," "Fuck you you dumb fucking brick for brains girl," "I fucking hate you," and "Jump off a bridge."  Also on October 25, 2020 Mack sent Andrea a text saying, "Tomorrow you will regret this," "I'll tear your a [*sic*] little stupid ass down if I want to," and "You've gotten in my way so much."  Mack also asked Andrea for money.  Andrea responded,  "I'll just transfer the money over into your account whenever I have it."  Mack replied, "No you'll do it tomorrow / you aren't wasting another minute of my time / and you won't disagree with me again / I warned you."

On October 26, 2020 Mack continued to call and text Andrea, but she did not answer or respond.  When Andrea returned home from shopping and unlocked her door, Mack ran up behind her and pushed her to the ground in the apartment.  Andrea's bags fell on the kitchen floor.  Andrea screamed for help for several minutes, but Mack hit her harder and told her to stop screaming.  Mack attacked Andrea for hours.  He hit her on her face, head, arms, back, and torso.  He also grabbed her by the neck, kicked her, and slammed her to the ground several times.  And Mack hit Andrea twice on her head with her cell phone.

Mack demanded Andrea pay him $50,000 for the time they spent as a couple.  He took $2,000 from her wallet.  Mack continued to hit and choke Andrea after he took the money.

Andrea talked to Mack and tried to calm him down. Eventually she convinced him to drive her to the hospital. Mack told Andrea not to tell anyone what had happened. He stopped the car in the middle of the street two blocks from the hospital, took Andrea's keys, and said he was going to take a rideshare vehicle back to Andrea's apartment. Andrea drove herself the rest of the way to the hospital. She was treated in the emergency room and transferred to another hospital. She had a swollen eye, blurred vision, a broken nose, an orbital fracture, a swollen lip, a bruised spine, dizziness, and vertigo. She had bruises on her back, neck, hands, and forearms. Andrea's head wound (where Mack struck her with the phone) required nine staples.

While Andrea was in the hospital, Mack called and texted her. One of his text messages said: "If you're out and not in the hospital and still not at least saying something to let me know you're good you deserve to die. I've been looking in every hospital for you all day since this morning and you haven't told me anything." When Andrea left the hospital and returned to her apartment, it appeared that Mack had stayed there and that he had tried to clean the blood from the walls, floor, and bathtub.

C.    *December 2020:  Mack Chases Andrea in His Car*

On December 5, 2020 Andrea came out of a building in Orange County and saw Mack in his car in the parking lot. Andrea got in her car and drove away, and Mack followed her. Andrea called the 911 emergency operator. Mack chased Andrea, at one point pulling up next to her car and telling her to "give him his money." A sheriff's deputy stopped Mack's car. On the front passenger seat the deputy saw a backpack containing a baseball bat, duct tape, and rope still in its original packaging.

4

D.     *The Jury Convicts Mack, and the Trial Court Sentences Him*

The People charged Mack with two counts of willfully inflicting corporal injury resulting in a traumatic condition on someone with whom the defendant had a dating relationship (Pen. Code, § 273.5, subd. (a)),[1] one count of assault with a deadly weapon (the phone) (§ 245, subd. (a)(1)), and one count of first degree residential robbery (§ 211). The People alleged that, for all counts, Mack personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). The People also alleged as aggravating factors for all counts that the crimes involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)); that the manner in which the crimes were carried out indicated planning, sophistication, or professionalism (*id.*, rule 4.421(a)(8)); that Mack engaged in violent conduct that indicated a serious danger to society (*id.*, rule 4.421(b)(1)); and that Mack's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings were numerous or of increasing seriousness (*id.*, rule 4.421(b)(2)).[2]

The People presented their case, and Mack testified in his defense. He stated Andrea moved out of their apartment in October 2020 after they argued. Mack testified that, soon after Andrea left, their landlord threatened to evict him. Mack tried to contact Andrea because he needed her to sign something to stop

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     The People withdrew the aggravating factor under rule 4.421(b)(2) before the trial court instructed the jury.

5

the eviction, but Andrea did not respond to his calls or text messages. Although Andrea did not give Mack her new address, he was able to find the building she lived in because, before she moved out, he tracked the location of her cell phone. Mack went to Andrea's new apartment building, but he could not find her name on the call box. He entered the parking garage when the gate opened. Mack walked through the parking garage and found Andrea's car. He entered a stairwell and looked for Andrea on four or five floors, then climbed 20 floors to check the rooftop. Mack returned to the garage, sat down next to Andrea's car, and waited for her until eventually a janitor told him to leave.

The next day Mack went to Orange County to look for Andrea at her workplace, but he did not find her. He returned to Andrea's apartment building, but he did not find her there either, so he went to a nearby skate park. While Mack was at the skate park, Andrea contacted him by video call and asked him to take her to the hospital. Andrea gave Mack her apartment number. When he arrived, Andrea was bloody and sitting on the floor. She said she had been "jumped." Mack talked with Andrea for an hour. He asked her about her relationship with another man. Andrea was bleeding, but coherent. Mack drove Andrea to the hospital in her car. She wanted to go into the hospital by herself, so Mack dropped her off at the emergency room entrance. Andrea gave Mack the key to her apartment, and he took a ride share vehicle to the apartment. Mack denied taking money from Andrea's wallet while he was at her apartment.

Mack next saw Andrea on November 1, 2020, when she and her father came to the apartment she had shared with Mack to retrieve her belongings and serve Mack with a temporary restraining order. Andrea's father retrieved clothing from the

6

apartment.  Mack testified Andrea's father took Mack's money from a drawer.

On December 5, 2020 Mack went to Andrea's workplace in Orange County.  When she drove away, he followed her in his car.  He pulled up next to her and said:  "Give me my money."  Mack testified he had all his belongings in the car, including a baseball bat for protection.

The jury found Mack guilty of first degree robbery and willfully inflicting corporal injury for the October 2020 incident.[3]  The jury found true the allegation Mack personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)).  The jury found Mack not guilty of assault with a deadly weapon, but guilty of the lesser included offense of misdemeanor assault (§ 240).  The jury found true two of the three aggravating factors: that the crimes involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)); and that the manner in which the crimes were carried out indicated planning, sophistication, or professionalism (*id.*, rule 4.421(a)(8)).

The trial court sentenced Mack to a prison term of 10 years four months, consisting of the middle term of four years for robbery, plus four years for the great bodily injury enhancement, and a consecutive term of one year (one-third the middle term of three years) for inflicting corporal injury to a cohabitant, plus 16 months (one-third the middle term of four years) for the great bodily injury enhancement.  On the misdemeanor assault conviction, the court sentenced Mack to 180 days in county jail

---

[3]     The jury found Mack not guilty of willfully inflicting corporal injury for the February 2020 incident.

and stayed execution of the sentence under section 654.  Mack timely appealed.

## DISCUSSION

A.      *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Mack's Uncharged Act of Domestic Violence*

Mack argues the trial court abused its discretion in admitting evidence he chased Andrea's car in December 2020. He contends the evidence's probative value was "substantially outweighed by its risk of causing undue prejudice and confusion." The trial court did not abuse its discretion.

1.      *Applicable Law and Standard of Review*

Under Evidence Code section 1101, subdivision (a), evidence of specific instances of a person's conduct is generally inadmissible to prove that person's conduct on a particular occasion.  (*People v. Robinson* (2024) 99 Cal.App.5th 1345, 1351-1352.)  However, under Evidence Code section 1109, subdivision (a)(1), when a "defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."  "Critically, section 1109 is 'an express exception to the prohibition against [bad character or] propensity evidence set forth in . . . section 1101, subdivision (a).' [Citation.]  '[T]he statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are "uniquely probative" of guilt in a later accusation.  [Citation.]  Indeed,

proponents of the bill that became section 1109 argued for admissibility of such evidence because of the "typically repetitive nature" of domestic violence. [Citations.] This pattern suggests a psychological dynamic not necessarily involved in other types of crimes.'" (*People v. Megown* (2018) 28 Cal.App.5th 157, 168; see *Robinson*, at p. 1352 [section 1109 reflects "the Legislature's determination that in sexual offense cases and domestic violence cases, 'similar prior offenses are uniquely probative of a defendant's guilt on a later occasion'"].)

Under Evidence Code section 352, the trial court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." When exercising discretion whether to admit evidence of uncharged acts of domestic violence, the trial court must balance the probative value of the evidence "'"against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses."'" (*People v. Thomas* (2021) 63 Cal.App.5th 612, 630; accord, *People v. Robinson, supra*, 99 Cal.App.5th at p. 1352; *People v. Barefield* (2021) 68 Cal.App.5th 890, 905; see *People v. Falsetta* (1999) 21 Cal.4th 903, 917 [similar factors for determining the admissibility of evidence of defendant's prior sex offenses under Evidence Code section 1108].) "'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.'" (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274; see *Thomas*, at p. 630.) We review

the trial court's decision to admit evidence of domestic violence for abuse of discretion. (*Robinson*, at p. 1351.)

> 2. *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence Mack Chased Andrea's Car in December 2020*

The December 2020 incident was similar enough to the uncharged October 2020 incident to be probative of Mack's propensity to commit domestic violence. As the trial court recognized, unlike the October 2020 incident, the uncharged offense involved "no direct physical contact." However, in both incidents Mack tracked Andrea down and was, in the trial court's words, "lurking around" and "lying in wait for her." Though the two incidents had differences, they were part of a pattern of exerting control over Andrea by monitoring her activities and following her. (See *People v. Brown* (2011) 192 Cal.App.4th 1222, 1237 [evidence of the defendant's prior acts of domestic violence against the victim was admissible as "indicative of defendant's 'larger scheme of dominance and control,'"" which the defendant attempted to assert over the victim "as he became angry, watched her activities, followed her, and tried to prevent her from having any other relationships"].)

The trial court did not abuse its discretion in concluding the probative value of the December 2020 incident was not substantially outweighed by the probability it would create substantial danger of undue prejudice. The evidence of the car chase was less inflammatory than the evidence Mack beat and kicked Andrea for hours in her apartment, fractured bones in her face, and left her with a head wound. (See *People v. Wang* (2020) 46 Cal.App.5th 1055, 1078 [uncharged incident was less

10

inflammatory than the charged offense, "reducing the possibility the jury's passions would be inflamed by the uncharged conduct"].) There was little risk the evidence of the uncharged conduct would confuse the issues: The charged and uncharged incidents occurred at different times and places. Nor was the uncharged conduct remote in time: It occurred less than two months after the charged offense. (See *ibid.* [incident that occurred three years earlier was not remote].) The evidence of the December 2020 incident did not consume much time either: The testimony of the deputy sheriff who pulled over Mack's car covered only 10 pages of more than 3,000 pages of trial transcript, and the descriptions by Andrea and Mack about the incident comprised relatively small portions of their testimony. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 533 [47 pages was not inordinate].)

Mack argues there were "significant dissimilarities" between the charged offenses and the uncharged conduct. Mack asserts that in December 2020 he followed Andrea in a car, whereas in October 2020 there were "no direct barriers" between the two. But Mack cites no authority for the proposition an uncharged incident of domestic violence that does not result in physical contact is not probative of the defendant's propensity to physically harm the same victim. And although Mack did not physically harm Andrea in the December 2020 incident, the evidence Mack had a baseball bat, rope, and duct tape with him supported the inference Mack intended to physically harm Andrea, but was stopped before he could do so.

Mack also argues the evidence of the baseball bat, rope, and duct tape was unduly prejudicial because it "invited the jury to completely speculate about [his] nefarious intentions." He also

11

asserts the audio of Andrea's call to the 911 emergency operator, which "was so provocative that the court needed to pause the proceedings to wait for Andrea . . . to calm down," was highly prejudicial. Mack argues the trial court abused its discretion in failing "to consider less prejudicial alternatives such as excluding irrelevant, though inflammatory, details surrounding the offense," in particular, "the testimony and photograph regarding the baseball bat, rope, and duct tape."

Mack is correct in suggesting the trial court could have admitted the recording of the call to the 911 emergency operator and the testimony of Andrea and the deputy sheriff who pulled over Mack's car, but excluded evidence of the baseball bat, rope, and duct tape. (See *People v. Disa* (2016) 1 Cal.App.5th 654, 672-674 [in a murder prosecution, although a prior conviction for domestic violence was admissible, the trial court abused its discretion in admitting highly inflammatory evidence of the "defendant's extensive planning and waiting in the prior incident"]; see also *People v. Falsetta, supra,* 21 Cal.4th at p. 917 [trial court should consider "excluding irrelevant though inflammatory details surrounding the offense"].) But the trial court recognized the prejudicial nature of those details and weighed the risk of undue prejudice against the probative value of the evidence. The court stated: "I have to say I was a little concerned about the rope, duct tape, and the bat. So I went back to the facts. If those were . . . in the trunk of the car, not together, I think it is a different analysis because there could be a very possibly totally innocent reason you might have that. . . . Having those items together in a backpack . . . next to him in the vehicle, I think is significant. I do think it will have a prejudicial effect on the defendant, but . . . I find that the probative value

12

outweighs the prejudicial effect." That ruling was within the trial court's discretion. (See *People v. Parker* (2022) 13 Cal.5th 1, 53 [trial court "'"has broad discretion"'" under Evidence Code section 352]; *People v. Merriman* (2014) 60 Cal.4th 1, 58 [trial court "has broad discretion" under Evidence Code section 1108].)[4]

   B.    *The Trial Court Did Not Violate Section 654 in Sentencing Mack*

Mack argues the trial court erred in not staying under section 654 execution of the sentence on one of his two felony convictions. He contends "the infliction of corporal injury was incidental to and facilitated the robbery." He also contends the trial court should have stayed execution of the great bodily injury enhancement on one of his two felony convictions.

   1.    *Applicable Law and Standard of Review*

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." Section 654 "precludes multiple punishments for a single physical act that violates different provisions of law

---

[4]    Mack also argues admitting evidence of the December 2020 incident violated his due process rights under the United States Constitution. It did not. (See *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1194 ["admission of propensity evidence under Evidence Code section 1109 does not violate due process"]; see also *People v. Falsetta*, *supra*, 21 Cal.4th at p. 917 ["trial court's discretion to exclude propensity evidence under Evidence Code section 352 saves Evidence Code section 1108 from defendant's due process challenge"].)

13

[citation] as well as multiple punishments for an indivisible course of conduct that violates more than one criminal statute." (*People v. Newman* (2015) 238 Cal.App.4th 103, 111-112, italics omitted.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*People v. Jackson* (2016) 1 Cal.5th 269, 354, internal quotation marks omitted.)

"'The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination.' [Citation.] A court's expressed or implied findings on this point must be upheld if supported by substantial evidence." (*People v. Kopp* (2019) 38 Cal.App.5th 47, 91; see *People v. Pinon* (2016) 6 Cal.App.5th 956, 968.)

2. *Substantial Evidence Supported the Trial Court's Finding Mack Had Separate Objectives in Committing Robbery and Infliction of Corporal Injury*

Substantial evidence supported the trial court's finding Mack robbed Andrea and inflicted corporal injury on her with separate intents or objectives. The violence Mack inflicted on Andrea went far beyond the force necessary to take her money. In an attack that lasted for hours, Mack hit her, grabbed her, kicked her, and hit her on the head with her cell phone. The trial court reasonably concluded that, for purposes of section 654, Mack's attack on Andrea was not merely a means of committing

14

robbery. (See *People v. Vasquez* (2020) 44 Cal.App.5th 732, 737 ["Section 654 'cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense.'"]; *People v. Bui* (2011) 192 Cal.App.4th 1002, 1016 ["an act of 'gratuitous violence against a helpless and unresisting victim . . . has traditionally been viewed as not "incidental" to robbery for purposes of Penal Code section 654'"]; *People v. Perry* (2007) 154 Cal.App.4th 1521, 1527 ["At some point, the degree of force or violence used or threatened may evince 'a different and a more sinister goal than mere successful commission of the original crime,' i.e., an independent objective warranting multiple punishment."]; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271-272 [defendant who repeatedly hit a 66-year-old, unresisting victim with a board used "far more" force than necessary to achieve the single objective of robbery].)

Substantial evidence also supported the trial court's finding that, although Mack committed the robbery and inflicted corporal injury on the same night in Andrea's apartment, they were "two discrete events" for purposes of section 654. Mack attacked Andrea as she arrived at her apartment. He beat her and demanded money. At some point Andrea went to her closet and retrieved her wallet. After Mack took her money, he continued to hit and choke her. Substantial evidence supported the court's findings that, once Mack took Andrea's money, the robbery was complete and that, from that point on, Mack had a different objective for the violence he inflicted. (See *People v. Coleman* (1989) 48 Cal.3d 112, 162 [trial court properly concluded the defendant had separate objectives in committing robbery and assault where, "[p]rior to the assault, defendant had essentially

completed the robbery"]; *People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1299-1300 [trial court properly imposed separate sentences for attempted robbery and attempted murder where the defendant shot the victim after the victim refused to hand over money from a cash register]; *People v. Phan* (1993) 14 Cal.App.4th 1453, 1466 [robbery and assault were separately punishable under section 654 where the defendant threatened to hurt the victim's son after taking the victim's wallet]; *People v. Foster* (1988) 201 Cal.App.3d 20, 27 [false "imprisonment of the victims occurred *after* the robbers had obtained all of the money, and therefore was not necessary or incidental to committing the robbery"].)

The cases Mack cites do not support his position.  In *People v. Mejia* (2017) 9 Cal.App.5th 1036 the court held section 654 precluded imposition of unstayed sentences for both torture and the underlying offenses of rape and infliction of corporal injury on a spouse.  (*Id.* at pp. 1044-1045.)  The court in *Mejia* concluded "all of the acts of spousal rape and of infliction of corporal injury on a spouse were included among the acts underlying the torture count and were essential to satisfying an element of that offense." (*Id.* at p. 1046.)  Here, as discussed, Mack's violent conduct exceeded what was required to commit robbery, and he continued to commit violent acts after he had obtained Andrea's money. Similarly, in *People v. Mitchell* (2016) 4 Cal.App.5th 349, the court held the trial court erred in imposing consecutive sentences for robbery and assault with a deadly weapon.  (*Id.* at p. 354.) But in *Mitchell* the defendant, unlike Mack, committed robbery and assault in a single act (threatening a store clerk with scissors and stealing merchandise).  In addition, the court in *Mitchell* stated the assault with a deadly weapon "was not a gratuitous

16

violent act or committed *after the robbery*." (*Ibid.*) Unlike the defendant in *Mitchell*, Mack committed gratuitous violent acts and continued to use force against Andrea after he completed the robbery.

### 3. *The Trial Court Did Not Err in Imposing Multiple Sentencing Enhancements*

Mack argues the trial court erred in imposing enhancements for great bodily injury under section 12022.7, subdivision (e), on his conviction for robbery and on his conviction for infliction of corporal injury. The trial court did not err.

If "section 654 does not bar punishment for two crimes, then it cannot bar punishment for the same enhancements attached to those separate substantive offenses. This is true even if the same *type* of sentence enhancement is applied to the underlying offenses." (*People v. Wooten* (2013) 214 Cal.App.4th 121, 130.) Because, as discussed, section 654 did not preclude the trial court from imposing terms on Mack's convictions for robbery and infliction of corporal injury, section 654 did not preclude the court from imposing enhancements on the two convictions.

### C. *The Trial Court Erred in Imposing a Domestic Violence Fund Fee*

The trial court ordered Mack to pay $500 to a domestic violence fund under section 1203.097. Mack argues, the People concede, and we agree the trial court erred in imposing this fee, which is authorized only when the court grants the defendant probation. (§ 1203.097, subd. (a).) Therefore, the court must correct the abstract of judgment to delete the $500 fee.

17

## DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the abstract of judgment to delete the requirement Mack pay a $500 fee to a domestic violence fund and to send a corrected abstract of judgment to the Department of Corrections and Rehabilitation.


SEGAL, J.


We concur:


MARTINEZ, P. J.


STONE, J.

18