Filed 1/17/25  P. v. Gallegos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARK GALLEGOS,<br><br>Defendant and Appellant. | F086040<br><br>(Super. Ct. No. BF187684A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

R. Chris Lim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Jessica C. Leal, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted defendant Mark Gallegos of driving under the influence of alcohol and causing bodily injury to Emmy E. (Veh. Code, § 23153, subd. (a); count 1) and driving while having a blood-alcohol content of over 0.08 percent and causing bodily

injury to Emmy E. (*id.*, subd. (b); count 2). The jury also convicted defendant of leaving the scene of the accident where he seriously injured Emmy E. (*id.*, § 20001, subd. (b)(2); count 3) and driving without a valid license (*id.*, § 12500, subd. (a); count 4). The jury found true allegations as to counts 1 and 2 that defendant personally inflicted great bodily injury upon Emmy E. and Ariany R., causing them to become comatose or suffer paralysis (Pen. Code, § 12022.7, subd. (b)); he caused great bodily injury to Emmy E. and Ariany R. (*id.*, § 12022.7, subd. (a)); and he caused bodily injury to more than one victim (including Sandra R. and Isaac E.) (Veh. Code, § 23558).[1]

In this appeal, defendant challenges the Penal Code section 12022.7, subdivision (b) great bodily injury enhancements, asserting the court erred in imposing terms for two of these enhancements as to count 1, and contending insufficient evidence supports the enhancement as to Ariany R. He also argues the court erred in instructing the jury on the causation standard with regard to the great bodily injury enhancement and in preventing defense counsel from arguing the victims' failure to wear seat belts was a defense to the enhancements.

We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with driving under the influence of alcohol and causing bodily injury to Emmy E. (Veh. Code, § 23153, subd. (a); count 1), driving while having a blood-alcohol content of over 0.08 percent and causing bodily injury to Emmy E. (*id.*, subd. (b); count 2), leaving the scene of the accident where he seriously injured Emmy E. (*id.*, § 20001, subd. (b)(2); count 3), and driving without a valid license (*id.*, § 12500, subd. (a); count 4) after he was involved in a car accident on December 25, 2018. Multiple enhancement allegations were also alleged.

---

[1]Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

*Collision on December 25, 2018*

On December 25, 2018, at around 2:00 a.m., Sandra R. was driving home from celebrating Christmas at her mother's house. Sandra was driving a Honda Pilot. Her father-in-law Julio was in the front passenger seat, her son Isaac was in the middle row of seats, and her daughter Emmy and niece Ariany were in the third row of seats. Sandra's husband Franklin was driving his tow truck behind Sandra's car.

Sandra testified she approached an intersection driving a normal speed and the light was green. She did not recall what happened after that. Franklin saw the Pilot approaching the intersection of Niles Street and Sterling Road; the light was green. He testified Sandra was in the left lane driving 35 to 40 miles per hour. Sandra entered the intersection and then her vehicle was hit by another vehicle on the driver's side near the front tire. Ariany testified she and Emmy were taking pictures in the back seats right before the collision. Ariany stated she did not have her seat belt on.

After witnessing the collision, Franklin parked his truck in the intersection and his son Isaac came running to him. Franklin put on the lights of his tow truck and began looking for his family. He saw his wife in the Pilot and she "appeared to be … asleep." Franklin believed her injury rendered her unconscious. He unbuckled her seat belt and pulled her out of the car. Sandra was still unconscious. Franklin ran around looking for his niece and daughter when he heard someone yell out that they had found someone. Franklin found his niece Ariany lying in the grass; "[h]er face was full of blood." Ariany was not awake, conscious, or responsive.

Franklin heard someone else yell out and he quickly went to find Emmy, who was 12 feet from the car. "Her head was destroyed." She had "a big hole" in her forehead area and near the left back side of her head. He told Emmy to breathe and to spit but she did not respond at all. The paramedics arrived quickly and transported both girls to Kern Medical Center. Franklin was never approached by the driver of the other vehicle at the scene of the accident or contacted by him after.

3.

Sandra woke up in the hospital. Her neck was swollen; she was bruised and had a wound on her head; there were pieces of her molars in her mouth. She was in the hospital for five days. She saw Emmy six days after the accident; "[i]t was hard to recognize her." Emmy underwent multiple surgeries for her head, stomach, and foot. Since the collision, Emmy has been unable to speak, walk, or move on her own. Franklin testified that 98 percent of Emmy's "brain is dead." Julio's sternum was also fractured during the crash, and he was in the hospital for two days. Isaac was given medication for pain, though Sandra did not see visible cuts or injuries on him.

Ariany testified she remembered the car being upside down, her head bleeding, and crawling to the grass and then waking up in the hospital. She had stitches on her head; her stomach and knee were hurting. Ariany had to have "lots of therapy" to be able to walk again. Ariany also received therapy to be able to speak again. Her speech is still affected and she has seizures and memory loss since the accident. At the time of trial, Ariany was still receiving care.

Ariany's father Limber R. testified he received a call about the accident and went to the hospital. When he saw Ariany, she was not awake. She was bloody and had visible injuries to her forehead and knee and her fingers and toes were broken. She was transported to another hospital while asleep.

Limber testified Ariany was in a coma for three weeks and in the hospital for months. He explained "[i]t was an induced coma for three weeks because she had a high fever and that was the only way." Ariany had brain surgery and was intubated to get liquids. Limber was at the hospital with her "the whole time."

Dr. Manish Amin, a physician at Kern Medical Center, explained Emmy was treated at Kern Medical Center on December 25, 2018, and was in critical condition. Emmy was initially diagnosed in the emergency department with "hemorrhagic shock, laceration to her spleen, multiple contusions or concussion-type injuries to her lungs, multiple rib fractures, left clavicle fracture, collapsed left lung, multiple facial fractures,

4.

multiple skull fractures, and multiple … bleeds inside of her brain." She was transferred to the operating room at Kern Medical Center and then they tried to transfer her to Valley Children's Hospital in Fresno. Emmy was intubated, meaning given a breathing tube.

Dr. Amin testified Ariany was also admitted to the Kern Medical Center on that date before being transported to Loma Linda hospital. Ariany's left clavicle was fractured; she suffered a contusion to her lung and lacerations to her forehead and knee and had multiple brain bleeds. She was also intubated.

### Accident Investigation

Officer Nicholas Barry arrived at the scene of the crash at approximately 2:47 a.m. The Honda Pilot was on its roof partially off the roadway and a gas station parking lot. A Saturn was also partially in the gas station parking lot and touching a sign that had been knocked over during the crash. The Saturn was empty when Officer Barry approached it and none of the parties involved in the accident were on the scene. A single shoe was located at the scene.

Barry identified Sandra R. as the driver of the Honda Pilot and contacted her at the Kern Medical Center where she and the other passengers of the Pilot had been transported. Barry also spoke to Julio and Isaac. He could not speak to Emmy or Ariany because they were unconscious and being treated at the time.

Barry learned another individual potentially involved in the crash—defendant— had arrived at the Kern Medical Center and was in the emergency room. Defendant had on one shoe that matched the shoe found at the scene. He had blood on him and was lying on a gurney. Defendant admitted he was involved in a crash at the location being investigated; he reported he was the driver of the Saturn during the collision. Defendant asserted the other car, the Honda Pilot, ran a red light. When Officer Barry asked defendant why he left the scene, defendant stated he was scared.

Officer Barry noticed the smell of alcohol on defendant's breath when he spoke and that defendant had red, watery eyes and slurred speech—signs and symptoms

consistent with individuals who are under the influence and impaired by alcohol. Officer Barry asked defendant if he had been drinking. Defendant stated he had had five beers but had stopped drinking "way before he left." Defendant denied consuming any alcohol after the collision.

Officer Barry administered various field sobriety tests, including the horizontal gaze nystagmus test. The results of the tests suggested defendant was impaired and had a blood-alcohol concentration of over 0.08 percent. At 4:06 a.m. and 4:10 a.m., defendant provided two breath samples that had blood-alcohol concentrations of 0.105 and 0.103 percent, respectively. Officer Barry opined defendant had been driving the vehicle under the influence of alcohol and arrested him. He obtained a warrant to take a blood sample from defendant and was present for the blood draw at 5:34 a.m. that morning. The blood sample had a blood-alcohol concentration of 0.093 percent. A toxicology expert opined, using a retrograde calculation, that defendant's blood-alcohol concentration was between 0.129 and 0.183 percent when he was driving at around 2:10 a.m.

Officer Mike Bright testified, when the airbags in cars deploy, some vehicles have a control module that records certain information that includes the speed of the vehicle, whether brakes were applied, and whether seat belts were buckled. Bright obtained a download of the data stored in the airbag control module of the Saturn after the accident. According to the data, the Saturn was traveling at 72 miles per hour one second prior to impact.[2] The speed limit at the location of the accident was 40 miles per hour. Bright was unable to obtain a download from the Honda Pilot. However, based on his calculations, he determined the approximate speed of the Pilot to be approximately 38.5 miles per hour when it was struck by the Saturn.

---

[2]Bright explained the tires on the Saturn were slightly larger than the manufacturer's recommended size; so, the car's speedometer actually read slightly lower than the true speed of the car because it reflects the number of times the wheels are turning in a given period of time. Taking into account this discrepancy, Bright calculated the actual speed of the Saturn one second before the crash to be 73.26 miles per hour.

During his investigation, Officer Barry learned defendant did not have a valid license. Based upon his investigation, Officer Barry concluded defendant was at fault for the collision, and the primary collision factors were speed and alcohol impairment.

***Convictions and Sentence***

The jury convicted defendant of driving while under the influence of alcohol causing injury, to wit: Emmy E. (Veh. Code § 23153, subd. (a); count 1) and driving with a blood-alcohol level of 0.08 percent or more, causing injury, to wit: Emmy E. (*id.*, subd. (b)). As to counts 1 and 2 the jury also found true allegations defendant personally inflicted great bodily injury upon Emmy E. and Ariany R. (Pen. Code, § 12022.7, subd. (a)), he personally inflicted great bodily injury, to wit: coma or paralysis, upon Emmy E. and Ariany R. (*id.*, § 12022.7, subd. (b)), and he proximately caused bodily injury or death to more than one victim, the additional victims being Sandra R. and Isaac E. (Veh. Code, § 23558). The jury also found defendant guilty of committing a hit and run resulting in serious bodily injury, to wit: Emmy E. (*id.*, § 20001, subd. (b)(2); count 3) and misdemeanor driving without a valid license (*id.*, § 12500, subd. (a); count 4).

The court sentenced defendant to an aggregate term of 14 years 4 months, composed of the low term of one year four months on count 1, plus 2 five-year terms for the two Penal Code section 12022.7, subdivision (b) great bodily injury enhancements, 2 one-year enhancements pursuant to Vehicle Code section 23558, and a consecutive one-year term (one-third the middle term) for count 3.

## DISCUSSION

I. **The Court Did Not Err in Imposing Two Great Bodily Injury Enhancements as to Count 1**

Defendant argues the court erred in applying 2 five-year enhancements to count 1 because the plain language of Penal Code section 12022.7, subdivision (h) unambiguously prohibits the imposition of more than one enhancement pursuant to that section for "the same offense." He asserts "[t]he 'same offense' here relates to count one

7.

or Vehicle Code section 23153, subdivision (a), and the application of two five-year enhancements to the 'same offense' directly violates the plain meaning of the statute." We disagree.

Penal Code section 12022.7 provides in relevant part:

"(a) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years.

"(b) Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony which causes the victim to become comatose due to brain injury or to suffer paralysis of a permanent nature shall be punished by an additional and consecutive term of imprisonment in the state prison for five years. As used in this subdivision, 'paralysis' means a major or complete loss of motor function resulting from injury to the nervous system or to a muscular mechanism. [¶] … [¶]

"(h) The court shall impose the additional terms of imprisonment under either subdivision (a), (b), (c), or (d), but may not impose more than one of those terms for the same offense."

As defendant acknowledges, *People v. Ausbie* (2004) 123 Cal.App.4th 855, disapproved of in part on other grounds in *People v. Santana* (2013) 56 Cal.4th 999, 1011, expressly considered and rejected the argument defendant makes here. *Ausbie* construed Penal Code section 12022.7, subdivision (h) "as limiting the sentencing court to one of the subdivision (a), (b), (c), or (d) enhancements *for each injured victim*, but not as prohibiting the court from imposing a section 12022.7 enhancement for each victim of a single offense when there are multiple victims who suffered great bodily injury." (*Ausbie*, *supra*, at p. 864, italics added.) Said differently, it held "[p]roperly construed, subdivision (h) simply prohibits the trial court from imposing more than one section 12022.7 enhancement for injury to an individual victim." (*Ibid.*) *Ausbie* noted, "In enacting section 12022.7, the clear intent of the Legislature was to deter the infliction of serious bodily injury on victims of felony offenses." (*Ibid.*) It further concluded its

8.

"construction of section 12022.7, subdivision (h) is consistent with the general principle that the law requires greater punishment when there are multiple victims." (*Ausbie*, at pp. 864–865.)

We agree with the *Ausbie* court that the plain language of Penal Code section 12022.7, subdivision (h) "does not limit the number of section 12022.7 … enhancements to be imposed when there are multiple victims." (*People v. Ausbie*, *supra*, 123 Cal.App.4th at p. 864.) Contrary to defendant's contention, such an interpretation does not rewrite the statute. Rather, as the *Ausbie* court reasoned, "had the Legislature intended to limit the number of section 12022.7 enhancements a court could impose in a particular case involving multiple victims, it could have said so expressly." (*Ausbie*, *supra*, at p. 865.) We cannot "add a limitation which does not appear in the statute." (*Ibid.*) Furthermore, such a conclusion is in line with the "general principle that the law requires greater punishment when there are multiple victims." (*Id.* at pp. 864–865; see generally *People v. Alvarez* (1992) 9 Cal.App.4th 121, 128 ["a defendant who commits an act of violence against more than one person is legitimately punished for each victim of his violence"].) Accordingly, we cannot conclude the court erred in permitting the imposition of two great bodily injury enhancements pursuant to section 12022.7 as they related to two separate victims—Emmy E. and Ariany R.

## II. Sufficient Evidence Supported the Great Bodily Injury Enhancement as to Ariany R.

Defendant next challenges the Penal Code section 12022.7, subdivision (b) enhancement related to Ariany R., asserting insufficient evidence establishes she was in a medically necessary, induced coma. We conclude sufficient evidence supports the section 12022.7, subdivision (b) enhancement related to Ariany R.

### A. Relevant Procedural History

The court instructed the jury in part:

"Witnesses who were not testifying as experts gave their opinions during the trial. You may but are not required to accept those opinions as true or correct. You may give the opinions whatever weight you think appropriate. Consider the extent of the witness's opportunity to perceive the matters on which their opinion is based, the reasons the witness gave for any opinion, and the facts and information on which the witness relied in forming that opinion. You must decide whether the information the witness relied upon was true and accurate. [¶] You may disregard any or all or part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

The jury was also instructed that if it found "the defendant guilty of the crime charged in Counts 1 and/or 2, you must then decide whether for each crime that the People have proved the additional allegation that the defendant personally inflicted great bodily injury that caused Emmy E[.] and Ariany R[.] to become comatose or permanently paralyzed." "To prove this allegation, the People must prove that, one, the defendant personally inflicted great bodily injury on Emmy E[.] and Ariany R[.] during the commission of the crime; and, two, the defendant's act caused Emmy E[.] and Ariany R[.] to become comatose due to brain injury or to suffer permanent paralysis."

The prosecutor explained "the reason we charged this for Ariany was that for a period of time she was comatose due to her brain injury. We heard about her multiple brain bleeds that she had. And for Emmy, of course, she also had brain injury, … but she also has permanent paralysis."

Defense counsel argued there was testimony that Ariany was in a coma. He asserted, "[S]he was not put into a coma as a result of the wreck. She was put into a medically induced coma. That's not the same thing." Defense counsel argued, accordingly, "[t]hat enhancement does not … attach to that young lady."

## B. Standard of Review and Applicable Law

As discussed, Penal Code section 12022.7, subdivision (b) provides: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony which causes the victim to become comatose due to brain injury or to suffer paralysis of a permanent nature shall be punished by an

10.

additional and consecutive term of imprisonment in the state prison for five years. As used in this subdivision, 'paralysis' means a major or complete loss of motor function resulting from injury to the nervous system or to a muscular mechanism." "An offense is subject to the enhancement whether the offender caused the comatose state directly or indirectly by beating a victim to such an extent that physicians must induce a comatose state to treat the brain injury." (*People v. Cunningham* (2016) 244 Cal.App.4th 1049, 1054 (*Cunningham*).) There must be evidence showing the victim was comatose at some point, but the condition need not be permanent. (See *People v. Tokash* (2000) 79 Cal.App.4th 1373, 1378; *People v. Galvan* (2008) 168 Cal.App.4th 846, 855.)

Penal Code section 12022.7, subdivision (b) does not define "comatose" so "we understand it to have the meaning it bears in ordinary usage." (*Cunningham*, *supra*, 244 Cal.App.4th at p. 1054.) Citing the definition of "comatose" in Webster's Ninth New Collegiate Dictionary (1991), *Cunningham* concluded "a victim is comatose, for purposes of the enhancement, if she is in a state resembling a coma characterized by profound unconsciousness." (*Cunningham*, at p. 1054.)

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence is """"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.""""" (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (See *People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Powell* (2018) 5 Cal.5th 921, 944.) "The standard of review is the same in cases in which the prosecution relies mainly on

11.

circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence."'" (*People v. Navarro*, *supra*, at p. 302.) The jury's findings on enhancement allegations are reviewed under the same standard. (See *People v. Wilson* (2008) 44 Cal.4th 758, 806.)

It is the jury, not the appellate court, which must be convinced of a defendant's guilt beyond a reasonable doubt. (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11.) If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*Ibid*.)

## C. Analysis

Defendant argues "there was insufficient evidence that Ariany R.['s] induced coma was medically necessary." He notes Limber R.[3] testified Ariany was in a medically induced coma but asserts there was "no expert evidence that an induced coma had occurred" or "was medically necessary." He contends Limber was not qualified to render an expert opinion as to a medical diagnosis of whether Ariany was ever in a coma, citing Evidence Code sections 720 and 801. And he argues there was no testimony an induced coma was medically necessary. We reject defendant's arguments and conclude sufficient evidence supports the Penal Code section 12022.7, subdivision (b) enhancement related to Ariany R.

Defendant relies upon *People v. Tokash*, *supra*, 79 Cal.App.4th 1373 to argue the evidence was insufficient to establish Ariany was in an induced coma that was "medically necessary." It is true in *Tokash* the victim's treating doctor testified it was

---

[3]Defendant mistakenly refers to Limber R. as Ariany's mother and states Limber "had herself been through a terrible trauma, had suffered severe injuries herself, and may have misheard or simply been confused as a nonexpert." However, Limber testified he is Ariany's father and was not present during the collision, and there was no evidence Limber himself "suffered severe injuries."

12.

medically necessary to keep the victim in that case "'chemically in a coma with paralytics and sedatives'" for two months after an emergency surgery. (*Id*. at p. 1377.) And the *Tokash* court found such testimony sufficient to support "the factual determination that [the defendant] inflicted great bodily injury causing [the victim] to become comatose due to the brain injury," "[e]ven assuming [the victim's] condition had not degenerated into a medically defined coma at the time he was admitted to the hospital." (*Tokash*, at pp. 1378, 1377.) However, *Tokash* did not hold that expert testimony is *required* to establish an induced coma was medically necessary to sustain a Penal Code section 12022.7, subdivision (b) enhancement based upon a coma. And "'"[i]t is axiomatic that cases are not authority for propositions not considered."'" (*People v. Gray* (2023) 15 Cal.5th 152, 169, fn. 5.)

To the contrary, "[Penal Code s]ection 12022.7, subdivision (b) does not require that the victim be clinically diagnosed as being in a coma, but only that she be comatose, which is an unconscious state 'of, resembling or affected with coma.'" (*Cunningham*, *supra*, 244 Cal.App.4th at p. 1055 [concluding "[o]nly the comatose state is specified in the statute, and Dr. Guldner's testimony [he sedated the victim with medications designed to completely suppress consciousness] provided the jury with sufficient evidence to find that [the victim] was comatose"].) And, as defendant acknowledges, there was evidence to support a conclusion Ariany R. was in an induced coma following the accident. Indeed, Limber R. expressly testified his daughter was in a coma for three weeks. He stated "[i]t was an induced coma for three weeks because she had a high fever and that was the only way." He further testified Ariany underwent brain surgery and was intubated in order to receive fluids. Dr. Amin also testified Ariany was intubated and explained that she suffered "multiple brain bleeds."

The jury could have reasonably concluded from this evidence that Ariany was put in a medically necessary induced coma due to brain injury. That is, there was substantial evidence from which a reasonable factfinder could conclude Ariany was in a state

13.

resembling a coma characterized by profound unconsciousness and, thus, was comatose as defined in Penal Code section 12022.7, subdivision (b). (See *Cunningham*, *supra*, 244 Cal.App.4th at p. 1054.)

## III. The Court Did Not Err in Instructing the Jury on Causation or in Limiting Defense Counsel's Argument

Defendant next contends the court prejudicially erred by failing to instruct the jury that the victims' failure to wear a seat belt contributed to their injuries and by preventing his counsel from arguing the victims' failure to wear seat belts broke the chain of causation between his actions and their injuries. We disagree.

### A. Relevant Procedural History

Before trial, the prosecution moved to exclude any mention of the fact the victims may not have been wearing their seat belts. The prosecutor noted she did not find any information in the reports of that fact, though "it might be inferred that possibly they weren't."

Before trailing the matter to permit defense counsel to look into it, the court noted it did not think "[w]hether the people driving the vehicle were wearing seat belts or not is a fact" that "needs to be concealed from the jury." However, the court asserted "[t]he defense cannot argue or imply in argument that that in some way mitigates responsibility … in a criminal case." The court stated, "[I]f the People believe a pinpoint instruction is necessary, the Court will give one, but I don't want to put witnesses or anyone in the position of having to pretend that the lack of a seat belt didn't exist, and I think jurors would be curious on that issue as well to explain how the parties, if they were ejected, why they were ejected." The court continued, "[I]t goes to the nature of the collision and the injuries that resulted. It's not a legal defense, but it's a factual issue that I don't think is unduly prejudicial, and … the jury can separate with proper instruction and argument from counsel on how that would apply." The court trailed the matter to permit the defense an opportunity to research the issue and reply.

14.

The People requested the following special jury instruction on causation: "Facts attacking legal causation are only relevant if the defendant's act was not a substantial factor in producing harm or an injurious situation. A substantial factor is more than a trivial or remote factor." Defense counsel objected to the instruction and "to being stopped from arguing or speaking about the seat belt issue."

The court opined "the contributory negligence of a driving while impaired victim, while in a civil case can be contributory negligence and could be considered by the jury, but in a criminal case … the pinpoint Special Instruction Number 1 the People are requesting is the correct statement of law. It makes it clear that a substantial factor is more than a trivial or remote factor." The court stated its inclination to instruct defense counsel not to address or argue "that failure by a victim to wear a seat belt is a defense to these particular charges," which the court believed to be "a correct statement of the law." The court explained that defense counsel could "argue that the failure to wear a seat belt is a factor if the jury determines that the defendant's act[] was not a substantial factor." "So … it's a narrow bridge … the defense can appropriately trod, but you have to argue that—first, that the defendant's act was not a substantial factor, and if the jury makes that finding, then it can determine that … the failure of … the two children to not wear their seat belt can be considered. I think it has to be clearly couched in that language. To go outside of that particular language or structure is … inappropriate in a criminal case."

Defense counsel expanded upon his objection:

> "So specifically while the *Wattier* case that the prosecution mentioned in their in limine motion does state the law as in a special instruction, I believe the situation or the way in which I intend to argue this is distinguished from that in that, first of all, I don't believe that the lack of a seat belt in this situation should be considered a trivial or a remote factor, especially when considering that we have a direct comparison of victims with significantly … less harm as compared to the ones who were not in a seat belt in the same vehicle.

> "The reason I believe that's a relevant and an arguable issue goes specifically to the enhancements. Whereas *Wattier* discusses it as a defense

that should not be raised against a substantive charge, I believe it's a different issue when addressing specifically the level of injury. That is I don't believe or I agree as the law states that it should not be a defense to the particular substantive charge causing injury, but I do believe that it's highly relevant and appropriate for a jury to consider it when considering an enhancement which specifically addresses the degree of injury, and that is what makes the seat belt issue more than a trivial or remote factor. I believe based on the evidence that's been brought out during this trial there is a clear at least argument that that is the determining factor between the enhancement level of injury and general great bodily injury."

The prosecutor asserted there was "no evidence at all that specifically Emmy was not seat belted in." Additionally, she argued the "facts the defense wants to talk about … [are] only relevant if the defendant's act was not a substantial factor. We're looking at the causation of the harm; so I don't think that he's correct when he's looking at the type of injury or the significance of the injury. It's the causation of the act itself, which was the crash, where the consequence was the injury. So because the defendant's act was a substantial factor, I think that's really clear here, any other facts such as whether or not they were wearing seat belts is not relevant."

The court concluded it did "not see a distinction between the argument … made on either … the charge itself or on the enhancement. So with that, the attack has to be on the substantial factor, and if the defendant's act was not a substantial factor, then I think you can open the door for the comment that … the defense wants to make on a failure of one or more of the parties to not have a seat belt on, but obviously a road that counsel will have to tread carefully on."

The court instructed the jury on causation as to counts 1 and 2 as follows: "An act causes bodily injury to another person if the injury is a direct, natural, and probable consequence of the act, and the injury would not have happened without the act. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] There may be more than one cause of an injury, and that causes bodily injury to another person only if it

16.

is a substantial factor in causing that injury.  A substantial factor is more than a trivial or remote factor.  However, it need not be the only factor that causes injury."  The court then provided the special instruction.

The court instructed the jury on great bodily injury, Penal Code section 12022.7, as follows:

> "If you find the defendant guilty of the crime charged in Counts 1 and/or 2, you must then decide whether for each crime the People have proved the additional allegation that the defendant personally inflicted great bodily injury on Emmy E[.] and Ariany R[.] in the commission of the crime.
>
> "You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.
>
> "Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.
>
> "The People have the burden of proving each allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that the allegation has not been proved.
>
> "This instruction is titled Great Bodily Injury: Causing Victim to Become Comatose or Paralyzed.
>
> "If you find the defendant guilty of the crime charged in Counts 1 and/or 2, you must then decide whether for each crime that the People have proved the additional allegation that the defendant personally inflicted great bodily injury that caused Emmy E[.] and Ariany R[.] to become comatose or permanently paralyzed.  You must decide whether the People have proved the allegation for each crime and return a separate finding for each crime.
>
> "To prove this allegation, the People must prove that, one, the defendant personally inflicted great bodily injury on Emmy E[.] and Ariany R[.] during the commission of the crime; and, two, the defendant's act caused Emmy E[.] and Ariany R[.] to become comatose due to brain injury or to suffer permanent paralysis.
>
> "Great bodily injury means significant or substantial physical harm. It's an injury that is greater than minor or moderate.  [¶] Paralysis is a major

17.

or complete loss of motor function resulting from the injury to the nervous system or the muscular mechanism."

## B.      Alleged Instructional Error

Defendant first argues the court erred in applying the wrong causation standard with regard to the great bodily injury enhancement and failing to instruct the jury that the victims' failure to wear a seat belt could serve as a defense to the great bodily injury enhancements.

### 1.      Applicable Law

"'[A] trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.'" (*People v. Thomas* (2023) 14 Cal.5th 327, 385.) "'A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner."'" (*People v. Lewis* (2023) 14 Cal.5th 876, 900.)

### 2.      Analysis

Defendant concedes his counsel "did not ask for a specific instruction, but he instead stated, 'I accept that that should not be a defense to the substantive charge, the 23153, but I believe that it should be a defense to the enhancement,'" and asserts the trial court "refused his request." He asserts, "the trial court used the wrong causation standard for the enhancement," referencing the court's statement that defendant could "argue that the failure to wear a seat belt is a factor if the jury determines that the defendant's act was not a substantial factor." He argues, the great bodily injury enhancement requires that he

18.

must "personally inflict" injury, and it is not enough to show he proximately caused the great bodily injury, meaning his conduct was a substantial contributing factor to the injury. The People respond "any argument regarding the trial court's failure to give a pinpoint instruction is forfeited." They further contend, even if the issue was properly preserved the court would not have erred by declining to issue a pinpoint instruction "with a statement in conflict with established law." On reply, defendant argues the issue is not waived because the court has a duty to instruct the jury on general principles of law relevant to the evidence, which includes the "correct causation standard for the [great bodily injury] enhancement," and its failure to do so affected his substantial rights.

Here, contrary to defendant's argument, the court correctly instructed the jury that the great bodily injury enhancement requires a finding defendant "personally inflicted" injury on the victims. And, to the extent the defendant is arguing the trial court should have provided a more specific instruction on the issue of causation, such an instruction would be considered a pinpoint instruction "that the trial court is required to give, if at all, only upon request." (*People v. Bolden* (2002) 29 Cal.4th 515, 556; see generally *People v. Scully* (2021) 11 Cal.5th 542, 592 ["Pinpoint instructions 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte'"].) Because defense counsel did not request such an instruction below, the trial court had no duty to give it.

Notably, in discussing the causation standard for the great bodily injury enhancement with the parties, the court generally discussed the substantial factor standard as opposed to the personal infliction requirement. Nevertheless, the court did not misstate the standard with regard to the great bodily injury enhancement before the jury. Rather, as discussed, the court instructed the jury as to the Penal Code section 12022.7 enhancements that it "must … decide whether for each crime the People have proved the

additional allegation that the defendant *personally inflicted* great bodily injury on Emmy E[.] and Ariany R[.] in the commission of the crime" (italics added).

Thus, we reject defendant's argument the court prejudicially erred in instructing the jury on causation.

## C.       Limiting Closing Argument

Defendant also contends the court erred in preventing his counsel from arguing any failure by the victims to wear a seat belt could be considered as a defense to the great bodily injury enhancements.

### 1.       *Standard of Review and Applicable Law*

"Criminal defendants enjoy a constitutional right to have counsel present closing argument to the trier of fact.  [Citations]  This right, however, is subject to certain limits." (*People v. Simon* (2016) 1 Cal.5th 98, 147.)  "A trial court 'is given great latitude in controlling the duration and limiting the scope of closing' argument." (*People v. Edwards* (2013) 57 Cal.4th 658, 743.)  "We review a trial court's decision to limit defense counsel closing argument for abuse of discretion." (*People v. Simon*, *supra*, at p. 147.)

### 2.       *Analysis*

Defendant argues the trial court erred in "limiting closing argument on the correct legal standard."  Relying on *People v. Ollo* (2021) 11 Cal.5th 682, he argues the victims' injuries here were in part a result of their "unlawful conduct."  He contends "both victims were likely thrown from the car because they were not wearing seatbelts" in violation of Vehicle Code section 27315.  He asserts, like in *Ollo*, the trial court erred by not permitting him to argue he "had not personally inflicted their injuries because of their intervening fault."  He contends he was prejudiced by the trial court's application of "the wrong legal standard for causation as it applies to the [great bodily injury] enhancement" and the inability to argue "as the law permits."  The People disagree, asserting that permitting defendant to argue that he did not inflict the victims' injuries because of their

20.

intervening fault "would have been contrary to established criminal liability principles." They assert there can be more than one direct cause of great bodily injury, and the victims' action or inaction did not impact defendant's criminal liability. They argue, unlike in *Ollo*, the victims' alleged act or omission occurred before, not after, defendant's criminal act and, thus, "did not break the chain of causation." They contend defendant's driving was "the direct cause of the crash and the direct cause of the victims' injuries," and it does not matter if there may have been another direct cause of the great bodily injury.

We cannot conclude the court abused its broad discretion in precluding defense counsel from arguing the facts of this case did not support a great bodily injury enhancement because of the alleged failure of the victims to wear their seat belts. As discussed, the great bodily injury enhancements required the jury to conclude beyond a reasonable doubt that defendant personally inflicted the requisite injury on the named victims. The California Supreme Court has held the terms "personally" or "inflicts" when used in conjunction with "great bodily injury" does not imply the defendant must exclusively cause the victim's injuries. (See *People v. Ollo*, *supra*, 11 Cal.5th at p. 692.) Here, the prosecution presented evidence defendant was under the influence of alcohol, speeding, and ran a red light when he struck the victims' vehicle. "This volitional act was the direct cause of the collision and therefore was the direct cause of the injur[ies]." (*People v. Guzman* (2000) 77 Cal.App.4th 761, 764.) Thus, it is clear defendant personally inflicted the injuries. (See *ibid*.) The fact the victims may not have had their seat belts on "does not absolve appellant of direct responsibility for [the victims'] injuries." (*Guzman*, at p. 764; see generally *People v. Cole* (1982) 31 Cal.3d 568, 579 ["in enacting [Penal Code] section 12022.7, the Legislature intended the designation 'personally' to limit the category of persons subject to the enhancement to those who directly perform the act that causes the physical injury to the victim"].) Thus, the court did not abuse its discretion in concluding evidence that a victim may not have had her

seat belt on—evidence which was deemed admissible—was insufficient to constitute a superseding cause of the victims' injuries or a defense to the great bodily injury enhancement, and prohibiting defense counsel from making this argument.

Defendant's reliance upon *People v. Ollo*, *supra*, 11 Cal.5th 682 is misplaced.  In *Ollo*, the California Supreme Court concluded furnishing or giving a controlled substance to an individual who suffers injury from using the drugs is not by itself sufficient as a matter of law to establish personal infliction of great bodily injury under Penal Code section 12022.7.  (*Ollo*, at p. 685.)  It held, "To determine whether a defendant personally inflicts an injury, fact finders and courts must examine the circumstances of the underlying offense and the defendant's role in causing the injury that followed."  (*Ibid*.)

In *Ollo*, the defendant told his 16-year-old girlfriend, the victim, he had cocaine.  (*People v. Ollo*, *supra*, 11 Cal.5th at p. 685.)  She arrived at his house and snorted a line of a white powder; defendant did not partake.  (*Ibid*.)  The defendant's girlfriend fell asleep around 7:30 p.m., and the defendant fell asleep next to her after checking to make sure she was breathing at 9:00 p.m.  (*Ibid*.)  When the defendant woke up the next morning between 8:00 and 9:00 a.m., his girlfriend was nonresponsive, cold, and stiff.  (*Ibid*.)  He called 911 and his girlfriend was pronounced dead at the scene.  (*Ibid*.)  The white powdery substance collected near her body tested positive for fentanyl.  (*Ibid*.)  The jury convicted the defendant of offering a controlled substance to a minor and furnishing or giving away a controlled substance to a minor and found true an allegation defendant personally inflicted great bodily injury upon his girlfriend within the meaning of Penal Code section 12022.7, subdivision (a).  (*Ollo*, at p. 686.)

On appeal, the defendant in *Ollo* argued the trial court erred in precluding his counsel from arguing the facts of this case did not support a great bodily injury enhancement in light of the victim's voluntary ingestion of the controlled substance.  (*People v. Ollo*, *supra*, 11 Cal.5th at p. 686.)  The California Supreme Court agreed.  (*Id.* at p. 693.)  It explained "the meaning of 'personally inflict' is clear and unambiguous in

the context of injuries resulting from the direct application of physical force.  [Citation.] Commonly understood, the term 'personally' refers to 'an act performed "in person," and involving "the actual or immediate presence or action of the individual person himself (as opposed to a substitute, deputy, messenger, etc.)."'  [Citations.]  The verb 'to inflict' means '"to lay (a blow) on:  cause (something damaging or painful) to be endured:  impose."'  [Citations.]  The meaning of the statutory requirement that a defendant personally inflict the victim's injury does not differ from its nonlegal meaning. [Citation].  '[T]he phrase "personally inflicts" means that someone "in person" …, that is, directly and not through an intermediary, "cause[s] something (damaging or painful) to be endured."'  [Citation.]"  (*Ollo*, *supra*, at pp. 687–688.)  Thus, "[t]o be eligible for the great bodily injury enhancement, a defendant's participation in the act of ingestion must occur in circumstances in which the victim is not an independent 'intermediary' capable of breaking the 'personal[]' nexus between the defendant and the overdose injury."  (*Id.* at p. 690.)

The *Ollo* court concluded the trial court's advisement to defense counsel that he could not argue the defendant was not responsible for the injury because the victim voluntarily took the drugs was error.  (*People v. Ollo*, *supra*, 11 Cal.5th at p. 693.)  It reasoned "[t]he trial court's statement of the law contravenes our reasoning that the voluntariness of a victim's ingestion is a key consideration in the determination of whether a defendant personally inflicts great bodily injury in the drug furnishing context."  (*Ibid.*)  Accordingly, "[t]he trial court erred by precluding defense counsel from making a legally valid argument that the facts of this case do not support a great bodily injury enhancement."  (*Ibid.*)

*Ollo* is inapposite.  Here, any alleged failure by a victim to wear a seat belt is not akin to a victim who, with full capacity, voluntarily chooses to ingest a controlled substance.  That is, the court did not abuse its discretion by preventing defense counsel from arguing any alleged failure by Emmy or Ariany to wear a seat belt made them

23.

"independent 'intermediar[ies]'" that were "capable of breaking the 'personal[]' nexus between the defendant and the … injury." Rather, as discussed, defendant's actions in speeding through a red light while intoxicated necessarily resulted in defendant personally inflicting injury on the victims during the crash. Any alleged failure by a victim to wear a seat belt before the collision occurred did not break the causal nexus between defendant's actions and the victims' injuries as did the victim's voluntary and affirmative actions in *Ollo*.

Accordingly, we cannot conclude the trial court erred, and we reject defendant's contentions.

**DISPOSITION**

The judgment is affirmed.


PEÑA, Acting P. J.

WE CONCUR:


SMITH, J.


FAIN, J.*

---

*Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.